## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BERNARD GALLO** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No. 1:22-cv-01092-APM** |
| | : | |
| **WASHINGTON NATIONALS BASEBALL** | : | |
| **CLUB, LLC** | : | |
| | : | |
| **Defendant.** | : | |

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S
### MOTION FOR PARTIAL DISMISSAL

COMES now Plaintiff Bernard Gallo, and opposes Defendant's Motion for Partial Dismissal of Plaintiff's claims (hereinafter "MFPD"), for the reasons set forth below. Defendant fundamentally misunderstands Mr. Gallo's claims under the Americans with Disabilities Act (ADA) and conflates "legal sufficiency" of Mr. Gallo's allegations with Defendant's own view of "factually accurate" allegations.  On a motion to dismiss, therefore, Defendant's arguments fail, and Mr. Gallo's allegations are sufficient to state his claims.

### I.      FACTS MATERIAL TO DEFENDANT'S MOTION

For eight years, Mr. Gallo performed his job as a Major League Scout, successfully locating prospective baseball players for Defendant.  Complaint ("Compl." Dkt. No. 3) at ¶¶ 13-14.  Then, when the pandemic hit in 2020, until his termination in 2021, Mr. Gallo continued performing all the functions of his job using virtual options and electronic communications.  Compl. at ¶ 13.

Defendant then imposed a vaccinate-or-terminate mandate for Covid-19 vaccination on August 12, 2021, providing a deadline of September 26, 2021, for nearly all but union-represented employees of Defendant.  Compl. at ¶¶ 16-17, 20.  Indeed, it appears that, not for medical or scientific reasons, nor as dictated by Centers for Disease Control (CDC) guidance or District of Columbia Health officials, but solely based on robust legal representation and contractual prohibition, the nearly "universal" mandate would not apply to Defendant's athlete team members.  Of course, the main in-person contact Mr. Gallo *might* have in his job position as Scout would be with recruits who may become team baseball players, the very employees not subject to Defendant's stringent mandate. Compl. at ¶ 20.

The policy further indicated, without elaboration, that those employees like Mr. Gallo who would not obtain their Covid-19 vaccinations according to the pre-set timetable would first be placed on administrative leave without pay and their employment reviewed by Defendant's HR department.  Compl. at ¶¶ 21, 31.  If they continued to refuse Covid-19 vaccination, termination would follow the unpaid leave.  *Id.*  Defendant never explained how unpaid leave and investigation by HR was logically related to medical, health, or scientific concerns regarding Defendant's "duty to provide and maintain a workplace that is free of known hazards" and policy "to safeguard the health of our employees and their families, our customers and visitors, and the community at large from COVID-19."  Compl. Exhibit A, Dkt. No. 1-3.  For example, there is no explanation — nor could there be — why not paying Mr. Gallo while he was on leave was related in any way to safety. *See* Compl. at ¶¶ 46, 87 (alleging that employees terminated around the same time for non-vaccine reasons were paid).

Mr. Gallo promptly exercised his legal rights objecting to the policy and requesting an exemption to Defendant's vaccinate-or-terminate policy by filing a religious exemption on August 12, 2021.  Compl. at ¶ 22, and Exhibit B, Dkt. No. 1-4.  The "accommodations" he sought were, in essence, *status quo* – the same set of practices that Defendant had found to be acceptable health and safety policies during the pandemic in 2020 through the summer of 2021.  Compl. at ¶ 28.  Defendant's HR representatives interrogated Mr. Gallo in response to his application for exemption, and finally on August 27, 2021, Defendant's Vice President and General Counsel informed Mr. Gallo his exemption was denied.  Compl. at ¶¶ 25, 27.  Defendant acknowledged Mr. Gallo's religious beliefs were sincere, but asserted without substantiation that because the FDA approved one of the Covid-19 vaccinations, Mr. Gallo could not continue performing the duties of his position, as it posed "an unacceptable risk to the health" of Defendant's employees – specifically including Mr. Gallo himself, as well as customers, visitors, and others with whom Mr. Gallo might interact while performing his duties.  Compl. at ¶¶ 27, 41, Exhibit D, Dkt. No. 1-6. In other words, Defendant began taking the position that its own health and safety policies were impractical and unsafe.  Mr. Gallo requested an appeal and reconsideration of the denial of his exemption, which was denied.  Compl. at ¶ 34. The denial also made a boilerplate reference to Mr. Gallo's working conditions, without displaying any awareness of what they were.

On September 1, 2021, Mr. Gallo was placed on unpaid leave with a termination date of September 15, 2021.  Compl. at ¶ 35.  It is notable that Mr. Gallo's contract would expire by its own terms the following month, in October 2021.  Compl. at ¶ 46.  Yet again, Defendant's communication made clear that it did not see him as fit to perform the

functions of his job, not based in his performance to date, but because he was unvaccinated against Covid-19. *Id.* and Exhibit E, Dkt. No. 1-7.

In the two weeks Mr. Gallo was on unpaid leave, several things occurred.  Mr. Gallo's counsel alerted Defendant that it had violated the law in discriminating against Mr. Gallo for his religious beliefs; asserted Mr. Gallo was eligible, at a minimum, for the CDC-approved temporary exemption for prior Covid-19 infection; and requested Defendant reconsider continuing its unlawful conduct toward Mr. Gallo.  Compl. at ¶¶ 37-40. Defendant then (as now) failed to understand Mr. Gallo's request for medical exemption based on his past infection, and continued to assert that Mr. Gallo's status continued to pose an "unacceptable risk" to Defendant and its staff, such that he could not perform his job duties.  Compl. at ¶ 41.

## II.    STANDARD OF REVIEW

"The notice pleading rules are not meant to impose a great burden on a plaintiff." *Matthews v. Dist. of Columbia*, 730 F. Supp. 2d 33, 35 (D.D.C. 2010) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). Detailed factual allegations are not required. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When ruling on a Rule 12(b)(6) motion to dismiss, "[a]mbiguities must be resolved in favor of the plaintiff, giving him the benefit of every reasonable inference drawn from the well-pleaded facts and allegations in the complaint." *Hilliard v. Int'l City/Cnty. Mgt. Ass'n-Retirement Corp.*, 898 F. Supp. 2d 84, 87 (D.D.C. 2012). While the Court need not accept legal conclusions cast in the form of factual allegations, nor indulge in inferences unsupported by facts, *id.*, "the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor." *Matthews*, 730 F. Supp. 2d at 35 (citing

4

*Leatherman v. Tarrant Cnty. Narcotics & Coordination Unit*, 507 U.S. 163, 164 (1993)).

"The plaintiff must be given every favorable inference that may be drawn from the allegations of fact." *Id.* (citations omitted).

### III.    ARGUMENT

**A. Plaintiff Alleges Facts Sufficient to Sustain Claims of Defendant's Discrimination Against Him Based on Perceived Disability.**

Defendant articulates the elements of causes of action for discrimination under the ADA, but then bases its argument on an incorrect standard of review, urging the Court to draw inferences in Defendant's own favor and to question the veracity of Mr. Gallo's factual allegations. Defendant also grossly misreads the complaint, and spends a good deal of time arguing that this distorted version of the complaint fails to state a claim. Defendant spends roughly two pages (MFPD, at 7-8) introducing new information and arguing that Covid-19 is not a sufficient basis for "disability" under the law, and then asserts erroneously that Mr. Gallo has failed to plead facts that show that Defendant perceived him as disabled.

1. Defendant's own words denying Plaintiff's exemption state its view of Plaintiff's status as impaired within the definition of "disabled" under the ADA and DCHRA.

To state a claim under a "regarded as disabled" theory of discrimination, a plaintiff must allege that the employer regarded him as disabled, that he was a qualified individual, and that a covered entity discriminated against him on account of his perceived disability. *Catania v. Weremblewski*, 2022 WL 1094633, slip op. at *2 (W.D. N.Y. Jan. 12, 2022). There is no dispute that Mr. Gallo has pled facts sufficient to establish the second and third elements. With regard to the first element on a motion to dismiss, there is no

requirement that Mr. Gallo show Defendant was correct in its belief; it is enough that Mr. Gallo plead facts indicating Defendant believed him to be disabled. *Haynes v. Williams*, 392 F.3d 478, 481 n.2 (D.C. Cir. 2004) (explaining that "regarded as" can be established if an employer mistakenly believes the employee to have a disabling impairment, or mistakenly believes that the employee's actual impairment is disabling).

In its motion, Defendant attempts to rebut Mr. Gallo's claims of its belief by arguing that it would be "patently absurd" to perceive someone as impaired from performing a major life function (working) "by virtue of being unvaccinated". MFPD at 7 n.4. This is true of course, but it does not follow that Defendant did not hold such an absurd view,[1] nor that the absurdity of such a view is a defense. Even an irrational, inconsistent, or illogical belief is enough for a "regarded as" claim. *See MX Group, Inc. v. City of Covington*, 293 F.3d 326, 341–42 (6th Cir. 2002) (explaining that denying services based on myths about recovering drug addicts' propensity for violence amounted to a "regarded as" violation of the ADA).

Indeed, at its core, anti-disability animus is irrational and illogical. Diseases and disabilities, particularly those that are new and poorly understood — and especially those perceived (rightly or not) as contagious — can engender a degree of fear, panic, or revulsion that can lead otherwise reasonable people to forget themselves.

> Few aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness. Even those who suffer or have recovered from such noninfectious diseases as epilepsy or cancer have faced discrimination based on the irrational fear that they might be contagious.

---

[1] The fact that Defendant could view other unvaccinated employees as not being unacceptably dangerous shows that it held inconsistent and incoherent views on the subject—or, at least, that it was willing to pretend to hold those views as a cloak for its discriminatory intent.

*School Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 284 (1987) (footnotes omitted).

With the benefit of hindsight, such irrationality and bigotry seems grotesque, although at the time, and in the throes of a perceived emergency, it likely felt perfectly justifiable and normal. One well-known example from recent history was the AIDS epidemic, where the widespread fear of HIV led otherwise reasonable people to place unnecessary and even absurd restrictions on those who were infected. *See, e.g., Nolley v. Cnty. of Erie*, 776 F. Supp. 715, 742 (W.D. N.Y. 1991) (reproving jail official for his irrational *ad hoc* policy prohibiting HIV-positive inmate from attending church or using the law library, even though it was clear neither of these could spread the virus).

Another recognized phenomenon is employers' unwillingness to defer to lawful authority or medical expertise, and irrational attachment to the employer's own unsound judgments about safety and policy. In *Nolley*, for example, the jail official had been told that HIV could not be spread by casual contact such as sharing books and attending church, yet rejected official findings and directives, relying instead on his own layman's judgment about what precautions were appropriate.  776 F. Supp. at 718–19 and n.1. During the Covid-19 pandemic, the federal government initiated a general policy favoring vaccination, but left in place established law such as Title VII and the ADA, including the exemptions and accommodations available under them. Neither the CDC nor the EEOC thought it necessary to curtail or eliminate individualized religious exemptions, and the government itself granted exemptions to its employees. Compl. at ¶ 24. Defendant, however, rejected the government's authority and expertise, substituting its own medical and policy views.

This is evident in its refusal notice, where Defendant told Mr. Gallo that "in light of the fact that a fully approved vaccine is now available . . . ., your continued performance of your duties without being vaccinated will pose an unacceptable risk . . . ." Compl., Exhibit D, Dkt. No. 1-6. The value-laden reference to "unacceptable risk" presented by granting an exemption represents Defendant's rejection of the government's determination that the risk of granting exemptions was acceptable. Furthermore, Defendant's reasoning was perverse, since the availability of an assertedly safe and effective vaccine, of course, would result in *less* risk, not more, to everyone as more people were vaccinated. Defendant was fully prepared to accept the higher level of risk *before* a vaccine was approved, but *after* one became available, Defendant irrationally deemed a lower level of risk "unacceptable." The "unacceptable risk" determination also implies that requiring Mr. Gallo to violate his own religious beliefs would be acceptable. In short, it is apparent that Defendant thought civil liberties laws were too lenient, and decided to pursue its own course.

The Supreme Court has discussed this phenomenon at length, pointing out that employers' absurd fears and inappropriate overreactions are the very reason for employment civil rights statutes. *Arline*, a case dealing with a teacher who had contracted but recovered from tuberculosis is particularly instructive.[2] There the employer, fearing that the teacher might suffer relapses and infect others around her, fired her. The Court explained at length that employers' visceral fears of contagiousness were a primary

---

[2] Although *Arline* arose under the Rehabilitation Act rather than the Americans with Disabilities Act, the discrimination analysis is the same. *See Works v. Colvin*, 93 F. Supp. 3d 405, 414 (D. Md. 2015) (citing *Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001)) ("A claim of disability discrimination under the Rehabilitation Act must undergo the same analysis as a similar claim under the Americans with Disabilities Act. . . .").

reason for the enactment of civil rights laws protecting disabled people. *Arline*, 480 U.S. at 285–86 (concluding that shielding those accused of being contagious from baseless discrimination was "precisely the type of injury Congress sought to prevent").

Defendant's concerns about Mr. Gallo's being dangerous to co-workers is all the more absurd, given that Mr. Gallo had only virtual and telephonic contact with them. Compl. at ¶ 13. While he attended college, junior college, and high school baseball games in person, all those games were held outdoors and with no required in-person interaction. *Id.* A more complete description of Mr. Gallo's working conditions is found in emails he and his counsel sent to Defendant's HR department. Compl. Exhibit C Dkt. No. 1-6 (response to question 10) and Exhibit F Dkt. No. 1-8 at 3-4. Exactly how Defendant thought Mr. Gallo was going to infect his co-workers over the phone or videoconferencing, or to infect players on the field while sitting in the stands in the open air is a mystery. Nevertheless, Mr. Gallo is not required to know or allege exactly what Defendant's misguided thought processes were when it decided his physical condition made him such a danger to himself and others that he could not do his job.

Although Mr. Gallo need not allege what Defendant thought the condition was, one reasonable inference is that Defendant regarded him as permanently infected with a dangerous disease (a danger to himself) or else uniquely contagious (more so than those unvaccinated for other reasons). *See* Compl. at ¶¶ 19–20, 28 (alleging that some but not all categories of employees were vaccinated). It is also plausible that Defendant thought Mr. Gallo was still infectious and a carrier of the disease even after recovering from it, as in *Arline*. Another reasonable inference is that Defendant thought Mr. Gallo's condition did not merely prevent him from working as a scout, but also prevented him from safely

interacting with or being around other people, and engaging in other major life activities that involved being around other people. Whatever Defendants' thinking was, the complaint makes clear that Defendant regarded Mr. Gallo as unable to work without creating a danger to himself and to others, and that the danger stemmed from his physical condition. Compl. at ¶ 41.

Defendant's arguments that Covid-19 prior infection is not a disability improperly rely on evidence not in the four corners of the Complaint. MFPD at 7-8. They are further inapposite here because Mr. Gallo has not alleged that his previous infection was in reality a disability. To the contrary, he correctly pointed out to his employer that it conferred some immunity, and that he was just as capable of doing his job as he had been before.

Defendant's mischaracterization of the facts as alleged by Mr. Gallo also leads it to mischaracterize the timeline.  MFPD at 9-11.  Mr. Gallo's claims of discrimination in Counts I and III are not based on his medical exemption request made in September 2021, but rather on Defendant's own statements in August, regarding its perception of Mr. Gallo's incapacity to perform his job functions without "unacceptable risk" to himself and to Defendant and its other employees, customers, and guests.  Defendant continued to rely on the same perception of Mr. Gallo in its responses to his counsel in September. Perhaps unwittingly, Defendant admits in its motion that it had made a determination to fire Plaintiff based on its view of his medical status when it first learned of his lack of vaccination for Covid-19, "well before" Plaintiff asserted his alleged immunity from prior Covid-19 infection.  MFPD at 10.  Indeed, the timeline set forth by Defendant, as detailed in Mr. Gallo's complaint, demonstrates that the basis for Mr. Gallo's termination, as stated

in the denial to his religious exemption, is Defendant's perception of his medical status and disability.

The Complaint provides several factual allegations detailing Defendant's statements and actions, demonstrating its perception of Mr. Gallo as disabled and terminating his employment *on that basis*:

> **Compl. at ¶¶ 27, 29, Exhibit D, Dkt. No. 1-6:** Attachment to Betsy Philpott email states, "The Company recognizes and respects your religious beliefs and would accommodate those beliefs if it could.  However, in light of the fact that a fully approved vaccine is now available, and given the nature of your position, duties, and essential functions, your continued performance of your duties without being vaccinated will pose an unacceptable risk to the health of the Company employees (including you), customers, visitors, and others with whom you are required to interact in connection with your job duties."

> "If you decide to get vaccinated, please let us know as soon as possible. You are a valued member of the Nationals team and your health and safety is of utmost concern to the Company."

> **Compl. at ¶ 35, Exhibit E, Dkt. No. 1-7:** Bob Frost writes, "We greatly appreciate the contributions you have made to the Company.  If you decide to get vaccinated, please let us know right away so that you can continue your employment with us."

> **Compl. at ¶ 41:** "Defendant, however, treated Mr. Gallo as if his health status rendered him dangerous to himself and unable to work, thus regarding him as disabled.  Defendant then requested more invasive and legally irrelevant information about Mr. Gallo's health, including asking him about medications and whether he had been vaccinated against the flu." [3]

> **Exhibit F, Dkt. No. 1-8:** Betsy Philpott writes, "As we have previously stated, we recognize and respect Mr. Gallo's religious beliefs but given the nature of his position, the Nationals cannot accommodate Mr. Gallo's

---

[3] These questions represent an attempt to discover information from which Defendant could conclude (or pretend to conclude) that Mr. Gallo was insincere in his claimed religious belief, although it had already accepted (or pretended to accept) his religious belief as sincere. Seeking pretexts for taking adverse employment action bespeaks a discriminatory intent. Absolutely none of the questions pertained to trying to determine whether there was a satisfactory way to accommodate Mr. Gallo's sincerely-held religious belief. *See* Compl., Exhibit C, Dkt. No. 1-5.

religious beliefs without posing an unacceptable risk to Nationals employees and individuals that Mr. Gallo is required to interact with in connection with his job duties."

**Count III, Compl. at ¶ 77:** "The assumptions made by Defendant after receiving notice of Mr. Gallo's medical status as unvaccinated against Covid-19 were used to justify Defendant's incorrect and unlawful determination that Mr. Gallo could not perform his job duties because he was disabled and would put the other Nationals employees at risk. This assumption is not based on any reasonable understanding of the facts regarding Mr. Gallo's ability to perform his essential job duties with or without accommodation. There was no factual support for the idea that Mr. Gallo **could not** perform his essential job duties with the use of a mask and frequent testing, at a minimum."

**Compl. at ¶ 79:** "The Nationals relied on Mr. Gallo's admission of being unvaccinated, were informed of his prior covid-19 infection and given proof of antibodies from prior infection and treated him as though he were contagious with covid-19, continuing to ostracize and pressure Mr. Gallo to get vaccinated immediately and show proof of at least one dose. Defendant ignored Mr. Gallo's objections and requests for exemption. When Mr. Gallo did not obtain vaccination within the arbitrary deadlines assigned by Defendant, Defendant fired him."

The Rule 12(b)(6) standard here is not concerned with whether Defendant *now* denies, after seeing the Complaint, that it viewed Plaintiff as disabled because of his medical status (including being unvaccinated against Covid-19), but whether it perceived him as disabled *at the time it suspended and discharged him* because of that perceived impairment. Mr. Gallo has sufficiently alleged facts, taken as true, to sustain this claim. He has also sufficiently pled that he was a qualified individual, and that Defendant is a "covered entity" subject to federal and state laws protecting employees—neither of which Defendant denies. Compl. at ¶¶ 6, 11, 72.

2. Defendant's urgency of action to terminate Plaintiff demonstrates its perception of his "disability" as a current, present danger.

Defendant fundamentally errs in its argument that Plaintiff must allege "facts that suggest he suffered . . . long-term or serious consequences as a result of his bout with

12

COVID-19" and that these were ongoing at the time Defendant unlawfully terminated him. MFPD at 8. Whether a perceived disability is "transitory and minor" under 42 USC § 12102(3), is a defense which Defendant has the burden to prove; a plaintiff is under no obligation to negate this defense in his complaint. *See Brown v. Roanoke Rehabilitation & Healthcare Center, et al.*, ___ F. Supp. 3d ___, 2022 WL 532936 at *5 (M.D. Ala., Feb. 22, 2022) (holding that "transitory and minor" was a defense for which a defendant bears the burden, and not an element of a plaintiff's pleading requirement); *Green v. ADCO Int'l Plastic Corp.*, No. 1:17-CV-337, 2017 WL 8810690, at *10 (N.D. Ga., Feb. 7, 2018) (citations omitted). In *Brown*, as here, the defendant employer presented new evidence outside the complaint, to support its argument that Covid-19 illness is a transitory and minor impairment, and therefore, Defendant *"could not have perceived Brown as disabled within the meaning of the ADA."* 2022 WL 532936 at *4 (emphasis added). The *Brown* court concluded that the defendant's introduction of additional evidence was outside the scope of a motion to dismiss and that the plaintiff was "not required to plead facts plausibly suggesting that the transitory and minor defense fails." *Id.* at *5-6.

Unlike the plaintiff in *Brown*, Mr. Gallo has not alleged that *actual* prior or current Covid-19 infection is the basis for his ADA claim of discrimination based on Defendant's perception of him as disabled. Compl. at ¶¶ 57, 59, 77, 79. As such, not only should the Court disregard Defendant's newly introduced allegations, but it should also disregard Defendant's assertions that Mr. Gallo has insufficiently pled "long-term or serious consequences as a result of his bout with COVID-19". MFPD at 8.

Though it is not a necessary element of Mr. Gallo's claims, he *has* pled sufficient facts to demonstrate that his perceived impairment, as understood by Defendant, is

neither transitory nor minor. Defendant's own words ("danger," "unacceptable risk") bespeak a serious and long-lasting impairment, as does its severe enforcement of its vaccine policy, to the point of termination — a measure not even meted out to scouts being let go for poor performance.  Compl. at ¶¶ 27, 29, 41, 46 & Exhibit D, Dkt. No. 1-6, Exhibit F, Dkt. No. 1-8; *see also* Compl. at ¶ 75, nn. 6-7. Defendant's refusal even to provide him with a CDC-approved temporary medical exemption based on prior Covid-19 infection is also probative of Defendant's perception of Mr. Gallo as having a dangerous impairment.  Compl. at ¶¶ 41, 45. Indeed, had he obtained such a temporary exemption, he could have renewed his contract and might have remained employed when the MLB significantly relaxed its Covid-19 policies on all teams in March of 2022, and when the schools where Mr. Gallo scouted relaxed theirs.  Compl. at ¶¶ 20, n.1; 28, n.3.

Defendant's arguments against Mr. Gallo's Counts I and III fly in the face of the Rule 12(b)(6) standard. The complaint alleges facts sufficient to state a cause of action under DCHRA and the ADA for discrimination based on a perceived disability.

**B.  Plaintiff Alleges Facts Sufficient to Sustain a Claim of Defendant's Retaliation Against Him For Engaging in Protected Activity.**

To make out a claim of retaliation under equal employment opportunity laws a Plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Ruggiero v. Mount Nittany Medical Center*, 736 Fed. Appx. 35, 41 (3d Cir. 2018) (citations omitted).  Defendant's argument that Mr. Gallo has failed to meet his pleading burden fails because it asks the Court to disregard the 12(b)(6) standard by not construing

the facts in the light most favorable to Mr. Gallo, and because Defendant patently misreads the Complaint's allegations.

1. Plaintiff's protected activity is the religious exemption filing as well as objection to Defendant's denial in violation of his rights.

Defendant misconstrues Mr. Gallo's allegations by stating that the first protected activity from which his claims of retaliation arise was *his lawyer's* communication articulating Mr. Gallo's objections to Defendant's unlawful conduct.  MFPD at 13.  Yet, even Defendant's motion admits that Mr. Gallo's first protected activity as alleged in the complaint was his religious exemption request, which included his objection to Defendant's vaccine policy ("abridgment of his right to exercise his religious beliefs") — although his objections to Defendant's discrimination in the denial of his exemption request, as articulated by his attorney, were also protected.  *Id.*, citing Compl. at ¶ 58.  As part of the exemption request, Mr. Gallo objected to the imposition of the mandatory vaccination policy as violating his religious liberty to make free choices concerning his own body. Compl. at ¶¶ 23, 58. He was not only requesting an exemption as provided for under law, but was also protesting and opposing an abridgement of his rights. As such, his request amounted to protected activity under Title VII. *See Touvian v. Dist. of Columbia*, 330 F. Supp. 3d 246, 251 (D.D.C. 2018) (opining that religious exemption request would amount to protected activity only if it also opposed an unlawful employment practice or alleged unlawful discrimination); *Payne v. Salazar*, 899 F. Supp. 2d 42, 52-53 (D.D.C. 2012) (same). Importantly, Mr. Gallo's position need not have been legally correct; it is enough that he objected to or protested the policy. *See Gonzalez v. Bolger*, 486 F. Supp. 595, 601 (D.D.C. 1980) ("Assuming arguendo that defendant's . . . policy

does not violate Title VII, plaintiff's opposition to the policy remains presumptively a protected activity.")

Here, Mr. Gallo has adequately pled protected activity of a good faith request for religious exemption from Defendant's vaccinate-or-terminate policy, which included objections to the violation of his rights. Compl. at ¶¶ 22, 58. He undertook this first protected activity as soon as the policy was announced, well before Defendant contemplated terminating him. *Id.* Defendant immediately began asking intrusive questions about Mr. Gallo's religion. Compl. at ¶ 25. Then within two days, it threatened adverse action — unpaid suspension and termination. Compl. at ¶¶ 27, 29. The temporal proximity of Mr. Gallo's protected activity and Defendant's threatened adverse action plausibly give rise to an inference of causation. Moreover, the threats were in direct response to and reference the protected activity. Defendant also used a "carrot and stick" approach, simultaneously asking Mr. Gallo to back down, and promising not to take adverse action if he did so. Compl. at ¶¶ 33, 35. This attempt at bargaining also implies that Defendant's plans with regard to Mr. Gallo were still contingent and open to revision.

Defendant's curious argument that it was predisposed to terminate Mr. Gallo even before he engaged in protected activity (MFPD at 13) is inconsistent with the complaint. Defendant's citation to *Von Drasek v. Burwell*, 121 F. Supp. 3d 143 (D.D.C. 2015), is wholly inapposite, given that Defendant was *not* planning to terminate Mr. Gallo at the time he submitted his exemption request and protested the policy.

The exemption request was not the only protected activity, however, nor was the threat of suspension and termination the only adverse action. Mr. Gallo's attorney's communications with Defendant's HR department pointing out the illegality of Defendant's

actions and asking Defendant to engage in the required "interactive process" represent a continuation of the earlier protected activity, or alternatively, a second set of protected activity. Compl.at, ¶¶ 37–45. Because Defendant had already mentioned the possibility of termination, it asks the Court to infer, contrary to law, that no later adverse actions could also have been a retaliatory response to this communication. *See Alston v. Dist. of Columbia*, 561 F. Supp. 2d 29, 43 (D.D.C. 2008) (citing *Weixel v. Bd. of Educ.*, 287 F.3d 138, 149 (2d Cir. 2002)) (holding that a "continuing series of back and forth protected activities and adverse actions" concerning the same issue sufficiently alleged causation to state a claim under the ADA).

The truth is, having one's errors pointed out is bound to sting. This is particularly true when the errors are within what should be one's own area of expertise, *i.e.*, HR directors do not relish being told they are violating employment law. Defendant, and in particular its HR personnel, knew they were supposed to engage in the interactive process; the vaccine policy even mentions the process explicitly. Compl. at Exhibit A Dkt. No. 1-3 at 2 (inviting employees to submit request for accommodation "to begin the interactive accommodation process"). *See Thomas v. Nat. Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 n.5 (10th Cir. 2000) (holding that Title VII requires an employer to engage in an "interactive process" to determine whether an employee's religious beliefs can be reasonably accommodated). This must have been particularly galling to Defendant's HR staff, because they had already agreed (and continue to agree) that Mr. Gallo's religious beliefs are sincere, and should be accommodated if possible. However, as the complaint makes clear, and as Defendant well knows, it shirked its obligation.

Once Defendant determined that Mr. Gallo's sincerely held religious belief conflicted with the vaccine policy, it should have engaged in the interactive process *in good faith* to see if some reasonable accommodation could be reached.  *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986); *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) ("[C]ourts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary.") Instead, all Defendant did was to continue asking intrusive questions about Mr. Gallo's religious beliefs. Compl. at ¶ 25 and Exhibit C Dkt. No 1-5. It asked no questions about his working conditions or how Mr. Gallo interacted with people; ignored his suggestions regarding reasonable ways to protect himself, co-workers, and others; avoided asking any questions to determine whether he was currently contagious; and issued a canned rejection that betrayed a total lack of awareness of how Mr. Gallo did his work. *See supra* note 3; *see also* Compl. at ¶ 56 and Exhibits C and D, Dkt Nos. 1-5 and 1-6.

Further retaliatory actions followed. The complaint points out that Mr. Gallo, through counsel, submitted a medical exemption request, which Defendant distorted and then summarily rebuffed. Compl. at ¶¶ 41, 44, 45 (alleging follow-up email from counsel pointing out Defendant had not engaged in the interactive process with regard to the later-submitted medical exemption request). Defendant also refused to consider new information Mr. Gallo was offering, and persisted in refusing to reconsider or reevaluate its decision even as conditions were changing. *See* Compl. at ¶ 20 n.1 (noting MLB's relaxed vaccination policy); ¶ 28 n. 3 (noting relaxed conditions in schools where Mr. Gallo scouted); ¶¶ 78, 85 (alleging later refusal to investigate or conduct individualized

assessment). The duty to provide reasonable accommodation "is a continuing one" and does not end after a single effort. *See also Wirtes v. City of Newport News*, 996 F.3d 234, 239 n.8 (4th Cir. 2021) (quoting *Ralph v. Lucent Techs., Inc.*, 135 F.3d 166, 171–72 (1st Cir. 1998)).  Although each new action or development should have resulted in new efforts to accommodate Mr. Gallo, Defendant instead found new ways to behave punitively towards him.

Further, it is not proper under Rule 12(b) standard to indulge in inferences against the plaintiff, e.g., to infer that Defendant's statements to Mr. Gallo were sincere and termination irrevocable. Indeed, the policy and Defendant's warnings declare otherwise: "the termination decision had been made, and *it could be undone only if Plaintiff became vaccinated* in accordance with the published policy."  MFPD at 13 (emphasis added); *see also* Compl. at ¶¶ 33, 35.   Mr. Gallo has also alleged that the unpaid suspension of fourteen days, pursuant to Defendant's policy, yet having no connection to health and safety concerns, seems designed only to coerce an employee like Mr. Gallo into compliance with Defendant's demand for vaccination, after he engaged in protected activity of filing the exemption request and objecting to the vaccination policy.  Compl. at ¶ 30.   Moreover, as to the September communications with Mr. Gallo's counsel, Defendant could and should have acknowledged its legal error and engaged in the legally-required interactive process prior to continuing forward with Mr. Gallo's termination.  Indeed, since Mr. Gallo was in a nearly total virtual employment capacity at that time, Defendant could have simply left his situation in status quo, rather than pursue unpaid leave and termination against Mr. Gallo.  Compl. at ¶¶ 56, 67, 78, 85. Instead, Defendant stubbornly continued to retaliate.

Defendant's motion spins the complaint's allegations regarding the scouts terminated for cause, as though identifying a similarly-situated employee were an element of Plaintiff's claims.  MFPD at 14-15.  The facts of other scouts' termination process are not pled as a "comparator analysis" for purposes of showing disparate impact of Defendant's policy. Nor are they, at the pleading stage, part of Mr. Gallo's case under a *McDonnell-Douglas* retaliation analysis where Defendant has provided rebuttal evidence to show a legitimate, non-retaliatory basis for its adverse action. Rather, Plaintiff's allegations show that these employees in the same job position as Plaintiff were *worse*-situated (performance-based termination), yet *better*-treated (allowed to work with pay through the end of their contracts). Mr. Gallo was recognized as performing at an acceptable level, yet he was suspended without pay two weeks before he was terminated with only a few weeks left in his contract.  Compl. at ¶¶ 78, 85.

2. Defendant's following of an unlawful policy does not render its application of that policy lawful.

Defendant's motion makes an embarrassing claim that having "followed the [vaccination] policy in every respect" is proof of non-retaliation.  MFPD at 13. An employer's own flawed policy does not have the force of law, so even assuming Defendant followed its own policy "to the letter," this is of no help to it. The policy treated some employees harshly, including Mr. Gallo, but did not apply at all to others. Compl. at ¶ 19. For subject employees, it applied inflexibly without regard to whether employees were required to have in-person contact with others. Compl. at ¶ 28. With regard to reducing the risk of Covid-19, it was both over- and under-inclusive.

Furthermore, Defendant absolutely did *not* comply with its policy. In particular, it utterly failed to engage in good faith in the interactive process that the policy required. As discussed *supra*, Defendant never engaged in any discussion about how Mr. Gallo's sincerely held religious belief could be accommodated. Furthermore, it ignored the information he voluntarily provided, and relied instead on vague, formulaic, and inaccurate references to his job duties and habits. It also rejected his later medical exemption request out of hand, without engaging in the interactive process at all. Nor did Defendant's policy require it to refuse to accommodate religious beliefs, while accommodating other employees' medical exemptions.

Thus, Defendants' arguments against all of Plaintiff's claims of retaliation fail, and the claims are sufficient to state valid causes of action.

## IV.   CONCLUSION

For the reasons set forth above, the complaint is sufficient to state a claim as to the identified causes of action, and the motion for partial dismissal should be denied. However, in the event the Court believes the complaint as currently pled has failed to state a claim as to any of the identified causes of action, Mr. Gallo asks that dismissal be without prejudice, so that he can seek leave to amend to cure the deficiency. See *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 130-31 (D.C. Cir. 2012) (holding that dismissal with prejudice is the exception, rather than the rule, and that dismissal should be without prejudice if successful amendment is possible).

This 26th Day of July, 2022.

Respectfully submitted,

_____/S/ Rachel Rodriguez_____
Rachel L.T. Rodríguez, Esq.
VIRES LAW GROUP, PLLC
DC Bar #501324
515 N. Flagler Dr., Suite P300
West Palm Beach, FL 33401
Phone/Fax: (561) 370-7383
rrodriguez@vireslawgroup.com

_____/S/ Charles LiMandri_____
Charles S. LiMandri, Esq.
LiMANDRI & JONNA LLP
DC Bar #383858
*Pro hac vice to DDC pending*
P.O. Box 9120
Rancho Santa Fe, CA  92067
Phone/Fax: (858) 759-9930/(858) 759-9938
cslimandri@limandri.com

*Special Counsel for Plaintiff Bernard Gallo*
*Appointed by*
Thomas More Society
309 W. Washington Street, Suite 1250
Chicago, IL 60606
Phone: (312) 782-1680

## CERTIFICATE OF SERVICE

I, Rachel L.T. Rodriguez, hereby certify that on this 26th day of July, 2022, a copy of the foregoing Plaintiff's Opposition to Defendant's Motion for Partial Dismissal was served by the electronic means using the Court's electronic filing system upon:

Michael J. Lorenger
651 South Washington Street
Alexandria, Virginia 22314
(703) 684-1800 Direct
(703) 684-1805 Fax
mlorenger@lorengercarnell.com
cburke@lorengercarnell.com

*Counsel for Defendant Washington Nationals Baseball Club, LLC*

_____//S//_____
Rachel L.T. Rodriguez

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **BERNARD GALLO** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No. 1:22-cv-01092-APM** |
| | : | |
| **WASHINGTON NATIONALS BASEBALL CLUB, LLC** | : | |
| | : | |
| **Defendant.** | : | |

**PROPOSED ORDER**

Having reviewed Defendant's Motion for Partial Dismissal, Plaintiff's Opposition thereto, and Defendant's Reply in support of its Motion, and for good cause shown, it is hereby:

ORDERED that Defendant's motion is **DENIED.**

.

Entered this _____ day of _____, 2022.

_____
Hon. Amit P. Mehta

Copies to:
Charles LiMandri, Esq.
Rachel Rodriguez, Esq.
Michael Lorenger, Esq.